**George BRICE et al., Plaintiffs,**

**v.**

**John B. LANDIS et al., Defendants.**

**No. 51805.**

United States District Court,
N. D. California.

Aug. 8, 1969.

Chas. Stephen Ralston and Oscar Williams, San Francisco, Cal., for plaintiffs.

Richard Sanders, Pittsburg, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a civil rights suit brought by plaintiffs, parents of children in the Pittsburg Unified School District on behalf of themselves and those similarly situated to enjoin the District from failing to adopt and implement a comprehensive plan for the desegregation of all schools within the District within the meaning of Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954).

Upon allegations that the District's present plan involving the closing of one of its schools, the Martin Luther King School, would result in continuing racial discrimination, this court issued its temporary restraining order enjoining the sale or lease of the Martin Luther King School to Contra Costa County.

On August 1, 1969, after hearing on defendants' motion to dismiss the suit and to dissolve the restraining order, the court issued its preliminary injunction enjoining the sale or lease until August 8th pending further consideration by the court.

The case is now before the court on the issue of further preliminarily enjoining the sale or lease of the school and on defendants' motion to dismiss this suit.

It appears from the record that the School District consists of seven elementary schools, two junior high schools and one high school; that the racial composition of school children in the District is approximately 28% black and 21% brown, i. e., 49% minority; that the high school is integrated but that certain elementary schools and junior high schools were racially imbalanced in the 1968–69 school year, e. g., among elementary schools, the Martin Luther King 99% negro; Heights 3.6% negro; Highlands 3.10% negro, Parkside 7.7% negro.

In March, 1968, the District decided on a plan for racial integration of its schools. Under this plan, effective September, 1969, the Martin Luther King School is to be closed (as far as elementary school purposes are concerned), and its pupils, 99% negro, are to be enrolled in and bussed to and from the Parkside, Heights and Highlands Schools which are within about two miles from Martin Luther King. The integration of the two junior high schools is to be implemented over a three year phase-in commencing September, 1969.

Eight of the fourteen class rooms of the Martin Luther King School are to be leased by the District to Contra Costa County for use in training mentally retarded children, 40% expected to be black. The remaining six class rooms

are to be retained by the District but will be used only for educating pre-school age children, most of whom are "expected" to be white. There is no showing, however, that either retarded children or pre-school age children are not now being cared for at other places or that there is any urgent reason for moving them into the King School.

According to defendant this plan has been formulated with the assistance and approval of a representative of the Bureau of Inter-Group Relations, State Department of Education. Further planning for integration, according to defendants, will be assisted by an Advisory Committee of black and white citizens.

The gist of plaintiffs' complaint is that the plan, although purporting to bring about racial integration in the schools, will in fact continue racial discrimination because the bussing of negro children, enrolled until recently in the Martin Luther King School, between their predominantly negro neighborhood and the Highlands, Heights and Parkside Schools located in predominantly white neighborhoods, will place the entire burden of the so-called integration on negro children and their parents while children of the predominantly white neighborhood schools will entirely avoid the necessity for transfer and bussing to other schools.

In addition to the present plan, three alternative plans were considered but all of them involved the closing out of Martin Luther King. Two of them would have transferred the King pupils to Highlands and the Highlands pupils to Village, one on a compulsory and the other on a voluntary basis, in order to make room for the King pupils transferred to Highlands. The other plan would have transferred the King pupils, together with all other elementary pupils, to Highlands, Parkside, Heights and Village under the so-called Princeton plan under which all pupils would be assigned to Parkside, Heights and Highlands according to grade level, i. e., grades 1–2 in one school, grades 3–4 in another and grades 5–6 in the third.

The plan selected, however, was the one to close out King and bus its pupils back and forth to the three other schools without involving the transfer or bussing of the pupils in the predominantly white neighborhood schools.

Plaintiffs allege that the Trustees of the District, under pressure to correct racial imbalance, selected and adopted the proposed plan, involving the closing of the King School because of opposition of the white community to bussing white children out of their neighborhood schools to a predominantly negro neighborhood school. This opposition, according to plaintiffs, was indicated in certain newspaper, telephone and PTA polls showing that over 75% of parents with white children were opposed to bussing their children to Martin Luther King while 100% of parents with children in Martin Luther King were in favor of two-way bussing, i. e., bussing arrangements that will fairly include *both* negro and white children.

Defendants allege, however, that these polls were taken in July, 1969, many months after an earlier decision of the District to close Martin Luther King; that in July the District merely refused to change that decision and that these polls played no part in the matter.

Defendants allege that the "primary" reason for the District's decision to close Martin Luther King as an elementary school is economic, stating that the cost of education per pupil there is twice as much higher than in any other school in the District, e. g., $200 more per pupil than at Highlands, because low enrollment per grade level at King requires the hiring of twice as many teachers as would otherwise be required and that the District will save $120,000 to $150,000 per year in teacher and administrator salaries by closing Martin Luther King.

A more reasonable inference from the record is that the unusually large number of teachers and other employees at King has been caused, not so much by low enrollment per grade, but by the more intensive instruction generally re-

quired for educating an all-minority, often underprivileged student body.

In any event, the claimed economic saving under defendants' plan implied (although defendants do not so allege) that at least half of the teachers, administrators and other employees presently at the King School can be and will be dismissed as no longer necessary.

How this can be done without greatly overcrowding classes and distorting teacher-pupil ratios at the three predominantly white schools which must necessarily absorb the present 269 students from King, is not explained by defendants. Further, it seems that any "low enrollment per grade level" at King could easily be remedied by adding students from other schools to the grades at King.

It is alleged by plaintiffs, and not denied by defendants, that the Martin Luther King School building is in good condition and is a good facility for teaching. Defendants' asserted reason for its closing is that it is "economically" unsuitable.

The problems involved in correcting racial segregation in the schools and the function of the United States District Courts in relation to those problems has been set forth by the Supreme Court in the key case of Brown v. Board of Education, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1954): "Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the prime responsibility for elucidating, assessing and solving these problems; courts will have to consider whether the action of the school authorities constitutes good faith implementation of the governing constitutional principles."

In Green v. School Board of New Kent, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, (1968), the court acknowledged: "There is no universal answer to complex problems of desegration; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance."

The issue presented in the pending case is whether the proposed plan of the District constitutes a good faith implementation of the governing constitutional principles involved.

■ It is basic that the primary responsibility for solving the problems involved is upon the state and local governments, and their administrative educational agencies, such as the Trustees of the defendant District, and that the federal courts should not lightly interfere with their good faith, and largely discretionary, legislative or administrative attempts to achieve the ultimate goal of desegregating their schools.

■ It does not follow, however, that every plan for such desegregation is beyond the jurisdiction, scrutiny and responsibility of the federal district courts. Plans, ostensibly designed to desegregate schools, can and have been rejected and restrained by the federal courts when found to fall short of good faith implementation of the constitutional principles involved. Green v. County of Kent, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Felder v. Harnett County Board of Education, 409 F.2d 1070 (4th Cir. 1969).

It is true that in the pending case the plan above described purports to bring about, after a fashion and in one sense, desegregation of the defendant District's schools. The question remains, however, whether the plan is actually a good faith, reasonably adequate plan, under the circumstances here presented, to implement these constitutional principles.

Certainly, if the means selected by the District to accomplish its purported purpose, themselves involve substantial elements of racial discrimination, its entire plan becomes suspect concerning whether it is really a good faith, reasonably adequate implementation of these principles.

■ It is true that the bussing of negro children to achieve integration,

when the circumstances so require, is not in itself discrimination. As a practical matter some transfer by bussing of negro children will obviously be involved in most integration plans. There may be practical situations in which minority groups could not reasonably complain that an equal or fairly comparable number of white children were *not* also being transferred by bussing, e. g., when the predominantly negro school is dilapidated or a fire hazard or otherwise physically unsuitable as to require closing.

Where, however, the closing of an apparently suitable negro school and transfer of its pupils back and forth to white schools without similar · arrangements for white pupils, is not absolutely or reasonably necessary under the particular circumstances, consideration must be given to the fairly obvious fact that such a plan places the burden of desegregation entirely upon one racial group.

The minority children are placed in the position of what may be described as second-class pupils. White pupils, realizing that they are permitted to attend their own neighborhood schools as usual, may come to regard themselves as "natives" and to resent the negro children bussed into the white schools every school day as intruding "foreigners." It is in this respect that such a plan, when not reasonably required under the circumstances, becomes substantially discriminating in itself. This undesirable result will not be nearly so likely if the white children themselves realize that some of their number are also required to play the same role at negro neighborhood schools.

Whether the plan, as here presented, is a good faith, reasonably adequate implementation of constitutional principles involved, must be determined in the light, among other things, of the alternative options and courses of action available to the District.

■ As stated by the Supreme Court in *Green, supra:*

"The matter must be assessed in *light of the circumstances present and the options available in each instance.* It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and *in light of any alternatives which may be shown as feasible and more promising in their effectiveness.* Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. *Of course, the availability to the board of ·other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method.* Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." (emphasis added).

Defendant District's claim that this particular plan is reasonably necessary because operation of the King School is operationally "uneconomical" in the respects above referred to, is inherently weak, poorly supported, unconvincing and indeed, hardly plausible.

■ In view of the other apparent options, alternatives and courses of action available to the District, plaintiffs' contentions that the present plan, involving the closing of the school and one-way bussing of its negro student body, is not a good faith, reasonably adequate implementation of the constitutional principles involved, is much more convincing at this stage of the proceedings.

Felder v. Harnett County, *supra*, although not precisely applicable to the

situation before this court, did deal with a somewhat similar plan. The court there said:

" * * * That plan proposed to close the three Negro high schools and assign their students to predominantly white high schools and to institute a study as to the best plan for completing a unitary system in both the elementary and high schools. It was patently not in compliance with the court's order. The only concrete proposal was in regard to the Negro high schools. There was no explanation offered as to how the School Board determined upon particular schools for extinction, nor did the closing plan disclose criteria for assignment of the students of the closed schools except for a cryptic reference to bus routes. Whether the School Board acted fairly or invidiously with reference to the Negro high school pupils is not disclosed either in theory or in the mechanics of a plan. There was no proposed pupil assignment of elementary students and no mention of ending racial discrimination in employment practices and in school activities. No resolution was made as to new school construction. For these deficiencies, the district court properly rejected the School Board's submission."

In *Green, supra,* the Supreme Court, rejecting a so-called "freedom of choice" plan, noted (note, 391 U.S. pp. 440–441, 88 S.Ct. 1689), the reasons why such plans, although not constitutionally unacceptable, generally prove burdensome to minority groups and, therefore, ineffective and said: (p. 441, 88 S.Ct. at 1696)

"Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents with a responsibility which *Brown II* placed squarely on the School Board. The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools."

The record now before the court justifies continuing in effect the present preliminary injunction against the sale, lease or other disposition of the King School pending trial of this case upon the merits, *or* until the District has sooner considered, and is prepared to effectuate an alternative plan, or some modification of the present plan, that will more fairly and adequately implement the constitutional principles involved as set forth herein.

If such a preliminary injunction is not issued the matter will become such an accomplished fact that plaintiffs herein will be, in effect, denied relief.

On the other hand, since the lease to the County of eight of the fourteen rooms of King School has not yet been finally closed and, since, as stated by defendant District, preparation for the September term can be made if this preliminary injunction issue is decided before August 13th, no great harm can be done as far as the District is concerned.

The preliminary injunction now in effect is therefore extended, modified in the respects above noted, and defendants' motion to dismiss the suit is denied.