Cynthia D. GREEN, etc., et al., Plaintiffs,

v.

The SCHOOL BOARD OF the CITY OF ROANOKE et al., Defendants.

No. 1093.

United States District Court,
W. D. Virginia,
Roanoke Division.

Aug. 11, 1970.

S. W. Tucker, Hill, Tucker & Marsh, Richmond, Va., and George W. Harris, Jr., Roanoke, Va., for plaintiffs.

James N. Kincanon, City Atty., and H. Ben Jones, Jr., Asst. City Atty., Roanoke, Va., for defendants.

## OPINION AND JUDGMENT

DALTON, Chief Judge.

This court is again faced with a controversy as to what the Roanoke City School Board must do to establish a unitary school system. This court previously approved a school plan by judgment dated November 18, 1969. The plaintiffs appealed to the United States Court of Appeals for the Fourth Circuit, which reversed the judgment of this court on June 17, 1970, and directed further proceedings consistent with its opinion. The school board and this court have been directed to "explore every reasonable method of desegregation, including rezoning, pairing, grouping, school consolidation, and transportation, including a majority to minority transfer plan." Green v. School Board of City of Roanoke, Va., 428 F.2d 811 (4th Cir., June 17, 1970).

As suggested by the Fourth Circuit, the school board obtained the services of consultants from the Department of Health, Education and Welfare. These consultants responded generously and submitted a plan of school desegregation on July 10, 1970. The features of this plan will be discussed later in this opinion. The school board considered this plan, accepting some provisions and rejecting others, and tendered its own plan to this court on July 15, 1970. The plaintiffs filed objections to the school board plan on July 21 and 22, 1970. This plan and the objections to it will also be discussed.

For purposes of discussion, the school proposals may be considered as three separate sub-plans: 1) A high school plan, 2) A junior high school plan, and 3) An elementary school plan.

## HIGH SCHOOL PLAN

In the past, Roanoke has had four high schools: Lucy Addison (825 capacity), William Fleming (1600 capacity), Patrick Henry (1200 capacity), and Jefferson Senior (1150 capacity). During the last school year, William Fleming and Jefferson Senior were fully integrated, but Lucy Addison was an all-black school, while Patrick Henry was completely white. To achieve full integration, the HEW consultants have proposed that Lucy Addison be closed and that the school district lines be drawn so that the percentage of black students in the three remaining schools will range from 22 to 25 percent. The school board is agreeable to this proposal and suggests the use of Lucy Addison as an advanced vocational education center and as a school for special classes which an individual school could not support. The plaintiffs expressly did not object to the closing of Lucy Addison in their exceptions filed July 21, but after a protest meeting, largely attended in the black community, did object on July 22 to the "Plan of the School Board to transfer only black pupils and to close only black schools in order to promote desegregation." The court takes notice of the understandably strong feeling in the Negro community against the closing of what they describe as "their" fine school.

## JUNIOR HIGH SCHOOL

The HEW plan proposes that seven different junior high schools be utilized for the 1970–71 school session. These schools are listed with their rated capacities in parentheses:

Breckenridge (700)
Jackson (800)
Madison (950, including annex)
Monroe (700)
Ruffner (750)
Booker T. Washington (675)
Wilson (670)

HEW's proposed district lines would result in varying percentages of black students in each school from approximately 20% to almost 39%. On the other hand, the school board proposes to close Booker T. Washington and draw the remaining school district lines to take in the area now served by that school. This proposal would include black students in each school in varying ratios from 21% to 27%. As a matter of pure racial balance, the school board proposal results in more "ideal" percentages than the HEW plan. The plaintiffs object to the school board's proposed closing of Booker T. Washington.

## ELEMENTARY SCHOOLS

During the past school year, the City of Roanoke operated twenty-six elementary schools. With their rated building capacities in parentheses, they are:

Belmont (540)
Crystal Spring (480)
Fairview (480)
Fishburn Park (240)
Forest Park (660)
Garden City (360)
Grandin Court (420)
Harrison (570)
Highland Park (660)
Huff Lane (420)
Hurt Park (420)
Jamison (660)
Lincoln Terrace (540)
Loudon (540)
Melrose (570)
Monterey (480)
Morningside (420)
Oakland (540)
Preston Park (420)
Raleigh Court (300)
Round Hill (420)
Virginia Heights (600)
Wasena (360)

West End (570)

Washington Heights (180)

Westside (480)

The essence of the HEW elementary school proposal is that primarily black and white schools be paired so that, instead of there being two schools both having grades kindergarten through six, there will be one school having grades kindergarten through three and another having grades four through six. Therefore, it proposes to pair Loudon, a black school, with Virginia Heights, a white school; Harrison, a black school, with Highland Park, a white school; Hurt Park, a black school, with West End, an integrated school;[1] Lincoln Terrace, a black school, with Oakland, a white school; and to group Fairview, a white school, with Forest Park, an integrated school, and Melrose, a black school.

HEW also proposes to pair Washington Heights (13% black) with Westside (37% black) to achieve a better racial balance. A further provision of the plan is that Fishburn Park, a modern brick school constructed in 1960, be closed.

Under this plan, the only black elementary students not attending fully integrated schools would be six children at Jamison and one child at Raleigh Court, which are both nearly all white.

The school board plan differs fundamentally from the HEW proposal. The only two schools to be paired under this plan would be Washington Heights and Westside, both of which have been defined as integrated schools. Instead of closing Fishburn Park, a totally white school in the southwestern part of the city, the school board proposes to close Loudon, an all-black school. It then proposes to bus the Loudon children to all-white schools having excess capacity as follows: 75 to Belmont, 145 to Highland Park, 60 to Grandin Court, and 70 to Preston Park. These children would be bussed at school board expense. Under this plan, there would be 3 black

schools, 11 white schools (less than 10% black), and 11 integrated schools.

The plaintiffs object to both the HEW and school board plans. They ask that this court assign a number of black and white students to each school so that no school can be identified as a "black" or "white" school. This objection apparently envisions a racial "balance" at each school and would presumably require massive cross-bussing.

The plaintiffs' other objections to the school board plan are that it should adopt a policy "to prevent the dismissal, demotion or reassignment of personnel on a racially discriminatory basis," that it should insure the transportation of all pupils on a non-segregated and non-discriminatory basis, that future school construction and consolidation should be planned to prevent resegregation and recurrence of the dual school system, and that students should not be allowed to attend schools outside of their school districts when the effect would be to lessen integration. The court is not quite clear as to the basis for the last objection because the board has proposed to continue its Majority to Minority transfer policy, which would seem to take care of this possibility.

The trouble experienced by school boards and courts attempting to solve knotty school integration problems is largely due to segregated residential housing patterns. At one time states acted affirmatively in establishing such patterns by enforcing private racial covenants to land, but since 1948 this practice has been unconstitutional. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Even though it has been more than twenty years since that decision, segregated housing patterns largely remain for both economic and discriminatory reasons. It will no doubt take years of patience and understanding to overcome these obstacles. The problem faced by this court is to make certain that the City of Roanoke

---

1. This court is of the view that an integrated school could be defined as one having 10% or more black students and 25% or more white students.

has a non-discriminatory school system and at the same time avoid striking a blow at high quality public education by requiring burdensome and unnecessary bussing of school children.

In years past, bussing of school children was wrongfully practiced to achieve segregation of school children. Such was the custom in the famous case of Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), which held unconstitutional a "freedom of choice" plan which failed to abolish the dual school system. In that case there was a non-segregated residential pattern in a rural county of 4,500 population, but students would "choose" to be bussed to the schools which were farther from their homes and which were primarily constituted of members of their own race. That is, bussing was used to maintain schools which were operated along racial lines. Now the clamor of many—unhappily endorsed by many courts—is to require bussing of children beyond schools in their own area to achieve some kind of vaguely defined "integration" or racial balance. This court cannot help but observe that bussing to preserve segregation was a gross injustice to the school children involved and that, with the tensions and strains currently caused by this issue, such needless bussing to obtain "integration" is equally harmful today. The question is whether the United States Constitution as interpreted by controlling court opinions requires that the neighborhood school concept be destroyed by compulsory bussing. If that is the price of integration, then the school children will be those who have to pay it.

The United States Congress has expressed its feeling on this subject by providing in the Civil Rights Act of 1964 that, in a civil action brought by the Attorney General, "nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to an-other * * * in order to achieve such racial balance * * *." 42 U.S.C. § 2000c–6(a) (2). This statute is mentioned for purposes of background because the present action is not one brought by the Attorney General and it has been pointed out that the statute does not prevent bussing to counteract illegal segregation of school students. Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138 (4th Cir., May 26, 1970). That opinion directed that in tackling a bussing problem "a school board should take into consideration the age of the pupils, the distance and time required for transportation, the effect on traffic, and the cost in relation to the board's resources." Id.

School boards have an affirmative duty to convert to a unitary school system. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). A unitary school system is one "within which no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). The desire of this court is to approve a plan which will achieve a unitary non-discriminatory school system with the least bussing possible. With these goals in mind, the court proceeds to the actual mechanics of the desegregation plan.

The court has taken a tour of the City of Roanoke and has actually observed most of the schools in question. It has noted the splendid brick construction (with its 10 acres of grounds) of Lucy Addison High School, which has been used only since 1951. In addition, the fact that Addison's closing will cause overcrowding in the three remaining high schools has not escaped this court's attention. The plaintiffs' objection that the black community should not be required to shoulder the largest part of the burden involved in the desegregation process has merit, although the realities of the actual physical facts makes such imposition difficult to avoid. The court does not feel that the school board or HEW have presented sufficient reasons

to justify the conversion of such a splendid facility, even if the school officials do express good faith intentions to use the school for advanced and vocational classes. There is a certain student and community feeling about a school which such a conversion would drastically diminish. Therefore, both the school board and HEW high school proposals are rejected, and Lucy Addison is to retain its present status. The school board is directed to use all four high schools and to draw attendance zones to achieve as much racial integration as is reasonably possible. Each high school should strive for a reasonable percentage of both black and white students. Rising seniors are to be permitted, if they so elect, to remain in the schools previously attended.

As discussed previously, the school board proposes to close Booker T. Washington Junior High School, while the HEW proposal entails operating all of the junior high schools. It has been noted that the school board's proposal results in a more "ideal" set of racial percentages in the junior high schools.

The court has observed the Booker T. Washington school and considered the testimony concerning it. Although the school is adjacent to a city park, it has only 1.3 acres in the actual school site and it is near a noisy highway. It has been suggested that the gymnasium addition can be operated in conjunction with the park as a community facility. School officials have informed the court that it contemplates using the building as administrative offices. The school board junior high school plan is generally adopted, except that the court is of the opinion, (in view of its decision to keep Lucy Addison open) that Booker T. Washington might well be operated as the specialized educational center envisioned by school officials for Lucy Addison.

The Westwood-Wilmont Farms area intervenors complain of the school line drawn between Ruffner and Monroe junior high schools. They propose a different line which would still result in both

schools being fully integrated. It appears that this appeal ought to be made to the school board instead of this court, and the school board is directed to reconsider this line and change it if the board deems it advisable.

Both the HEW and school board elementary plans are disturbing. The HEW plan results in practically 100% of the black elementary pupils attending integrated schools, but it requires extensive bussing and cross-bussing of young children. On the other hand, the school board plan requires less bussing because fewer schools are "integrated" and little cross-bussing is required. The school board's proposal to split up the Loudon children and transport them to separate schools does not particularly appeal to the court. However, in view of the age and physical condition of the building, the lack of adequate playground area, and the absence of any objection by counsel for the plaintiffs to the closing of Loudon, the court will approve the City plan in this respect. Perhaps the Loudon school may be suitable for use as school administration offices. This approval is made, however, with the request that the school board reconsider the problem of the placement of the Loudon children, keeping in mind the desire to minimize bussing. The court is not willing to say precisely how this should be done but it suggests that West End and Highland Park schools might be utilized to take care of a large number of the Loudon children.

It is further the opinion of the court that the proposed pairing of Washington Heights and Westside, two "integrated" schools, in order to achieve a "better" racial balance is unnecessary. If school district lines can be further altered to achieve greater "integration" without destroying the neighborhood concept, this should be done. Perhaps, for example, the Belmont school lines might be altered as suggested by the HEW proposal.

Except for these provisions, the school board elementary plan is approved.

■ The court has attempted to sustain the school board plan when it has found the methods employed to be reasonable and well-suited to attain the necessary goals. Since the school board is invested with the responsibility of operating the schools, the court believes that when the board's plans are constitutional, they should receive great weight and strong consideration. *See* Robinson v. Shelby County Board of Education, 311 F.Supp. 97 (W.D.Tenn.1970).

■ It is the opinion of the court that such an overall school plan meets the requirements of a unitary school system, and does not continue a dual system. Since such a system is one in which "no person is to be effectively excluded from any school because of race or color," Alexander v. Holmes County Board of Education, *supra,* it is the judgment of this court that the school board must furnish free transportation to a student in a "non-integrated" school who wants to attend the nearest or most convenient "integrated" school or school attended by students of another race. Such a policy must be carried out in conjunction with the Majority to Minority transfer plan, which the city is voluntarily practicing and should continue.

This proposal does not place the burden on individuals to change over from a dual school system because the court holds the plan adopted in this opinion constitutes the establishment of a unitary school system. *See,* Green v. County School Board of New Kent County, *supra.*

■ School officials should also enlarge and continue their efforts to involve children who attend "non-integrated" schools in activities with students of "integrated" schools or children of other races. These activities can take the form of athletic events, field trips, special classes, programs, and other endeavors which can be conducted on an integrated basis. It is believed that such activities can preserve the neighborhood school concept, spread the burden of desegregation equally, and bring children of differing races and backgrounds together in a less tense and more productive atmosphere.

■ It is recognized that this amount of "integration" in the elementary schools may be considered insufficient by some. The end result is that at least seven elementary schools will be "integrated": Forest Park, Huff Lane, Hurt Park, Round Hill, West End, Washington Heights, Westside, and possibly Highland Park and Belmont. Along with the fully "integrated" status of all the junior and senior high schools, the reasonable additional steps which will be taken at the elementary level are considered sufficient to establish a unitary school system. It is believed that it is a better policy to be cautious in the application of the law in this area than to require more bussing than is absolutely necessary. It is the court's view that the school board can better use the funds which would have been required for extensive bussing of students for the purpose of giving equally to all Roanoke school children a high quality educational program.

■ The assignment of black and white teachers to each school so that a balanced ratio can be obtained, as directed by the Fourth Circuit, is approved. The plaintiffs object to the absence of any non-racial objective criteria to be used in determining questions of dismissal, demotion or reassignment of personnel. This objection has merit and the school board is directed to adopt basically the "Desegregation of Faculty and Other Staff" proposals of the HEW consultants. It is meant by this for the school board to adopt fully non-discriminatory criteria in desegregation of school personnel, and it is believed that a smoother and more harmonious transition will thereby be accomplished.

■ Plaintiffs also object to the lack of any policy regarding future school construction and site selection. This objection also has merit. The school board is advised that the effect of a school's location on desegregation is a factor to be accorded substantial weight in deliberations on future constructions. New

schools ought to be built, so far as reasonably practicable, to alleviate the effects of segregated housing patterns and to prevent recurrence of a dual school system.

As previously set forth, the continuance of the Majority to Minority transfer plan and the adoption of a transportation policy providing free transportation to any student in a "non-integrated" school who wants to attend an "integrated" school in another district are also approved.

Continuing, the court would observe that integration has worked and is going forward in Roanoke and that there is little animosity existing between the races, and it is the hope that the momentum will steadily progress. Obviously, there is a general disturbance over bussing; understandably the vast majority of citizens of both races do not like the idea of bussing with its inconvenience and other objections. This court feels that all working together, that new plans can be devised and improvements made in existing plans for integration which will find support among public-spirited citizens, and thus increase the educational opportunities of the Roanoke school children.

### CONCLUSION

Admittedly the findings and conclusions set forth herein (and for that matter any other plan) have shortcomings and imperfections, but considering the total picture, the court is of the opinion that under the opinion and judgment here made, it may not be said that the Roanoke School System effectively excludes any child from any school because of his race.

The court will retain this case on the docket for such other and further relief as may be appropriate. All of which foregoing opinion and judgment the court doth ADJUDGE and ORDER.

The court is of the opinion that this decision and the order entered herein involve a controlling question of law as to which there is a substantial ground for

difference of opinion, and that an immediate appeal may materially advance the ultimate determination of this litigation, pursuant to the provisions of Title 28, U.S.C. § 1292(b). The decision of this court is binding on all litigants and interested persons until it is stayed, modified or reversed by the United States Court of Appeals for the Fourth Circuit.

The clerk of this court is directed to send a certified copy of this opinion and judgment to counsel of record.