**Nina E. GREENE et al., Plaintiffs,**

v.

**The SCHOOL BOARD OF the CITY OF ALEXANDRIA, Defendant.**

**Civ. A. No. 78–561–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

March 5, 1979.

S. W. Tucker, Henry L. Marsh, III, Hill, Tucker & Marsh, Richmond, Va., for plaintiffs.

E. Walker Dudley, Boothe, Prichard & Dudley, Alexandria, Va., for defendant.

MEMORANDUM OPINION

ALBERT V. BRYAN, Jr., District Judge.

In this action plaintiffs assert that the decision by the defendant, The School Board of the City of Alexandria (the Board), to close certain elementary schools in the Alexandria school system places the burden of bussing to achieve racial integration more heavily upon black students than upon white.[1] They allege that this burden is the result of a policy of terminating schools in predominantly black neighbor-

---

1. Actually the complaint itself does not make this assertion, but the testimony and briefs of the plaintiffs do. The Court assumes that the reason for the concentration by the plaintiffs

hoods. The following relief is requested to alleviate this alleged denial of equal protection:

    (a) An injunction against the defendant's continuing its policy and practice of terminating the operation of public schools because of their location in neighborhoods where the majority of the residents are black; and

    (b) A mandatory injunction requiring the defendant to reopen and maintain in operation the Robert E. Lee and Cora Kelly elementary schools.

The action is founded on 42 U.S.C. §§ 1981 and 1983 and jurisdiction is present pursuant to 28 U.S.C. § 1343(3).[2]

The case was tried to the Court on February 7, 1979 and decision was reserved to allow counsel for the parties to submit post-trial briefs. This has now been accomplished.

From the evidence presented at trial, including the exhibits, and upon consideration of that evidence in light of the briefs of the parties, the Court makes the following findings of fact and conclusions of law:

1. Plaintiffs are black children, attending or expecting in the future to attend public schools in the City of Alexandria, and the Alexandria Branch of the National Association for the Advancement of Colored People. No question is raised concerning the standing of the plaintiffs to bring this action, although since trial the plaintiff National Association for the Advancement of Colored People has acknowledged lack of sufficient proof to confer standing on it, and has moved to be dismissed as a plaintiff. That motion will be granted.

2. Defendant is the School Board of the City of Alexandria, Virginia, and is charged by law with the responsibility of establishing and maintaining a system of free public schools in the City. Included among its powers is the authority to provide for transportation of pupils.

3. As of March 31, 1973, the defendant operated fifteen (15) elementary schools with the percentages of black students as follows:

| | |
|---|---|
| Jefferson Houston | 96% |
| Cora Kelly | 87% |
| Theodore Ficklin (Ficklin) | 86% |
| Robert E. Lee (Lee) | 86% |
| Lyles-Crouch | 75% |
| Stonewall Jackson (Jackson) | 40% |
| Mount Vernon | 32% |
| Patrick Henry | 18% |
| Douglas MacArthur (MacArthur) | 11% |
| Maury | 8% |
| Ramsey | 6% |
| John Tyler (Tyler) | 4% |
| George Mason | 3% |
| Charles Barrett (Barrett) | 3% |
| James K. Polk (Polk) | 2% |

4. As a part of a general plan to completely desegregate all of the elementary schools in Alexandria, the defendant, effective June 30, 1973, took the following actions:

    (a) Ficklin was closed (and has since been torn down).

    (b) Polk and Jackson were paired.

    (c) Cora Kelly and Tyler were paired.

    (d) MacArthur and Lee were paired.

    (e) Maury and Lyles-Crouch were paired.

    (f) Jefferson-Houston and Ramsey were paired.

    (g) Patrick Henry, Barrett, George Mason and Mount Vernon were continued with each serving grades K through 6 (kindergarten through 6th grade).[3]

on bussing is that there was no testimony as to any other injury resulting from the closing of the schools.

2. The complaint contains class action allegations; however no motion to certify the action has been filed or brought on for hearing and the testimony at trial does not warrant the action being maintained as a class action.

3. Reference is made to Defendant's Exhibit 1 for a color coded indication of the schools paired and their attendance zones as each existed prior to the pairings. Important insofar as this case is concerned, but not indicated in the exhibit because the paired schools have contiguous attendance zones, the line of demarcation between the attendance zone of Lee and MacArthur is the Richmond, Fredericksburg and Potomac Railroad track where that track

By pairing is meant that one of the schools would serve grades K through 3 and the other would serve grades 4 through 6, for the combined school zones. In this way all of the children in the two zones would attend one school for grades K through 3 and the other school for grades 4 through 6. Bussing was used to transport children who lived in one school attendance zone but were attending the paired school in another zone. Under the pairing arrangement, therefore, a student would be bussed for approximately one-half of his or her K through 6 school career and not bussed for the other approximate one-half. In addition, some bussing was done within some zones for reasons unrelated to the objective of a racially integrated school system, such as where traffic conditions caused a safety problem for children who would have ordinarily walked to school.

Except to the extent that the closing of Ficklin school may be evidence of the practices complained of, plaintiffs do not challenge the propriety of the 1973 plan effecting racial integration of the elementary school system or the bussing instituted to accomplish that purpose. The plaintiffs' expert, Mr. Yale Rabin, testified concerning the impact on blacks of the bussing resulting from the original bussing plan. The pleadings, however, do not embrace in this action any more than a complaint that the present manner and practice of *closing schools*, and particularly the closing of Lee, Cora Kelly and perhaps Jackson, impacts on blacks more harshly than upon whites. Indeed, at trial counsel for the plaintiffs disclaimed any broader reach of the suit.

5. Because of repeated floodings and substantial damage to the school (in 1972 water reached a depth of 6 feet in the school library and approximately $400,-000.00 in damage was sustained), operations at Cora Kelly school were terminated effective June 30, 1976, and all students in that school's attendance zone have since been bussed to its paired school, Tyler. A flood

control project is currently underway which is expected to be completed near the end of 1979 or first of 1980. The defendant has not made a decision whether to reopen Cora Kelly but has committed itself no further than to reexamine the matter of its reopening when the flood control project is substantially completed, which has not yet occurred.

6. Effective June 30, 1978 the defendants closed Lee school and combined that school's operation with that of its paired school, MacArthur. MacArthur now serves grades K through 6 for the combined attendance zones.

7. Effective June 30, 1978 the defendant closed Jackson which had been paired with Polk and substituted Patrick Henry as the school to be paired with Polk. Patrick Henry thereafter was no longer a school serving grades K through 6.

### Policy and Impact of Closings

Although the Court was told that the figures could be ascertained, no evidence of the actual number of black students bussed from one zone to another was presented to the Court. The evidence in the case does not persuade the Court that the defendant's action of closing certain schools in fact results in blacks bearing the burden of bussing more heavily than do whites, or that the Board maintains a policy of terminating schools in neighborhoods where the majority of students are black. Plaintiffs' expert Rabin concluded that there was an impact falling more heavily on blacks; however his basis for that conclusion was in large part that the closed schools were in predominantly black neighborhoods. When pressed on this Rabin revealed that his area of consideration was one within a three or four block radius from the closed school[4] rather than one including that school's attendance zone. No one has questioned the propriety of the constitution of the attendance zones, and it is those zones which the

---

extends from the Jackson attendance zone to the Maury attendance zone.

4. Actually, following this rationale, the closed school Ficklin would have been considered as one in a predominantly white neighborhood.

Court feels should be considered in determining whether a closed school in that zone was serving predominantly children of one race. Since the bussing that takes place from one zone to the paired school in the other zone includes *all* the children in that zone, not just those in the three or four block area around the school, an evaluation of the racial composition of the entire zone is more appropriate. The evidence does not establish that the attendance zone of Lee school was predominantly black or that that of Jackson predominantly black or that that of Lyles-Crouch, the school Rabin concludes should have been closed instead of Lee, predominantly white.[5] The areas of green shown on plaintiffs' exhibit 17 purport to show the areas of black population in the City. That map does not show the attendance zones, and the areas in green are *not* the only areas of black population in the City. The exhibit unfairly fails to reveal that a significant number of black children of a school age for grades K through 6 reside in other areas of the City, some concentrated and some not. Plaintiffs' exhibit 20 (prepared by the Administrative Assistant to the Superintendent of Schools, Leone, but offered in evidence by the plaintiffs) reveals the number and approximate location of the black K through 6 school age residents of all the attendance zones. Moreover, if the attendance zones are superimposed on plaintiffs' exhibit 17, and the green areas to which Rabin testified *are* accepted as the principal areas where grades K through 6 black children reside, the conclusion that the attendance zone of Jackson is predominantly black, that that of Lee is predominantly black, and that that of Lyles-Crouch is predominantly white, is incorrect.

Regarding the specific mandatory injunctive relief sought here, it is quite relevant that the number of black students in the MacArthur attendance zone is in fact greater than the number of black students in the Lee attendance zone.

5. It should be noted that in some of the exhibits, figures are given for "enrollment" at certain schools. These figures are to be distinguished

*Reasons for School Closings*

Though the Court has found that the evidence does not establish that any policy or action of the defendant with regard to closing of schools throws the burden of bussing on blacks more harshly than whites, if the Court assumes that such a showing had been made or that the plaintiffs have made out a *prima facie* case, then the reasons for the closings must be examined. With those assumptions the burden would be on the defendant to justify its actions.

*(a) Robert E. Lee School*

As set forth previously, this school was closed effective June 30, 1978. The students in the school's attendance zone for grades K through 6 are and have been since September, 1978 attending MacArthur school. Although this action was filed on August 10, 1978, no preliminary injunction was sought. While this is obviously not dispositive of the issues raised in the case, it deserves noting.

The school population in Alexandria, for a variety of reasons, has declined substantially—from an enrollment of approximately 18,000 ten years ago to a present enrollment of approximately 12,000. The defendant was faced with the necessity, for financial reasons, of closing *some* schools. The plaintiffs do not contest this—their disagreement is with the choice of schools to be closed. The Board's decision to close Lee was based on the following:

(a) Lee's pupil count in its attendance zone had dropped approximately 50% and was at that time the lowest in the City.

(b) The location of Lee, at the intersection of I-95 and U.S. No. 1 and backing on to the City sewage disposal plant, was undesirable.

(c) Its two story structure, with the use of steps for its cafeteria and other facilities, made Lee undesirable for handicapped students.

from the number of pupils residing in a particular school's attendance zone.

(d) The decline in school enrollment made MacArthur or Lee logical choices to close.

(e) It was desirable to consider closing one of two paired schools and include the students from the closed school in the remaining member of the pair because:

(1) This would minimize disruption for students in that they would continue being with the same students, teachers and perhaps school with which they had been used to associating;

(2) It would maintain the racial balance which the pairing had successfully effected; and

(3) It would not affect any other school's racial balance.

(f) MacArthur was more centrally located in the City than Lee, which would give the Board more flexibility in adapting to substantial demographic changes in the City, which have already occurred in the last few years and which are expected to occur in the future. Lee on the other hand was in effect bound in by highways and the City boundary. Moreover, there were already many schools in the eastern part of the City.

(g) While the physical plants, including the play areas, of both schools were adequate, MacArthur is entirely a one-story building which is preferable in accommodating handicapped individuals.

(h) There were a greater number of black attendance age children in the MacArthur attendance zone than in the Lee zone.

(i) There would have been more overall bussing if MacArthur had been closed instead of Lee.

Plaintiffs attack the premise of the Board that it was limited, in its choice of which school to close, to MacArthur or its paired school Lee. They argue, principally through their witness Rabin, that Lyles-Crouch should be closed instead of Lee. Part of the reason for this is that Rabin considered Lyles-Crouch to be in a predominantly white neighborhood. The Court's disagreement with this has already been expressed. Rabin also based his conclusions in substantial part on the January 1973 report of Englehardt and Englehardt, Inc. (Plaintiffs' Ex. 1). To the criteria used by that firm in its functional scoring of the elementary school buildings (*id.* at p. 62), Rabin adds a factor for child population in the area of the school—that area, again defined by a three or four block area around the school, not by reference to an attendance zone. While this did not affect the ranking of the schools a great deal, it was offered to support to some extent the witness's conclusions. Rabin also relied substantially on other data from the Englehardt report. The data was at least five years old at the time the closings of Jackson and Lee were effected. Demographic changes in the City during that time have been significant. The report's out of date information cannot be considered a reliable basis for the witness's conclusion.

Moreover, while suggesting that Lyles-Crouch should have been closed, and perhaps Patrick Henry or Barrett, or both, Rabin ventures no opinion as to what should be done with the students attending those schools and how they would be inserted into other schools consistent with maintaining a racial balance in those schools.

Rabin also questions the importance of having students in a closed school continue to attend the school with which the closed school was paired. Of course an existing pairing is not sacrosanct, but the Court is persuaded that continuing in the paired school is an important, albeit not dispositive, factor for the Board to consider.

The Court concludes that the Board has properly considered all the relevant factors in arriving at its decision to close Lee and that the decision was fully justified by legitimate school board and student necessities and interests. Faced with a difficult choice, the Board made a rational and reasonable business decision uninfluenced by any improper racial motive.

### (b) Stonewall Jackson School

While no specific relief with regard to the reopening of Jackson is requested in the complaint, plaintiffs have presented evidence on that subject in support of their assertion that its closing was a part of the policy of which they complain.

The same general problems with regard to the necessity to close some schools because of declining enrollment and financial problems were present at the time the decision to close Jackson was made. The choice was between closing Jackson or Patrick Henry. Jackson was paired with Polk. If Jackson had been closed then Polk would have been a school serving grades K through 6. Patrick Henry was a K through 6 school already. Although Patrick Henry and Polk are located within a relatively short distance of each other, the closing of Patrick Henry would have eliminated the pairing concept, a result the Board felt undesirable. The Court concurs with this feeling, as previously expressed. Instead the Board decided to close Jackson and substitute Patrick Henry in its stead, thereby preserving the pairing concept.

In making its decision to close Jackson instead of Patrick Henry, the Board, in addition to its desire to preserve the pairing concept, considered the fact that Patrick Henry was a one-story and better all-around facility, whereas Jackson was inferior physically as well as being located on a heavily congested arterial street (Duke Street).

The Superintendent of Schools had recommended closing Patrick Henry temporarily because of the recent closing down of a large nearby apartment project, Shirley-Duke and Regina Apartments, with a decision on reopening Patrick Henry to be made when it was seen what plans were formulated for future development of the apartment area. His reasoning for this recommendation was not illogical. The Board, however, did not follow his rationale. And while it is not the function of the Court to substitute its judgment for that of the Board in matters of this kind, the Court is satisfied that the Board's decision was the proper one, made after a consideration of the relevant factors involved and uninfluenced by any improper racial motive or in furtherance of any policy intended or resulting in a bussing impact falling more harshly on blacks than upon whites. The Board has met any burden of showing a justification for the closing.

### (c) Ficklin School

Ficklin, as in the case of Jackson, is not the subject of specific relief sought in the complaint.

Ficklin was closed in 1973 and has since been razed. Its closing was part of an overall desegregation plan, the propriety of which is not here questioned. At the time of its closing it had the lowest enrollment and number of class rooms of any school in the City. While servicing a predominantly black school population, it did not lend itself to pairing, and its closing has not been shown to be in furtherance of any policy here sought to be enjoined. Bussing was the only reasonable solution to obtaining for that population an education in an integrated school system. *Cf. Green v. School Board of City of Roanoke,* 316 F.Supp. 6, 10 (W.D. Va. 1970), *modified* 444 F.2d 99 (4th Cir. 1971), *cert. denied sub nom. Winston-Salem/Forsyth County Board of Education v. Scott,* 404 U.S. 912, 92 S.Ct. 230, 13 L.Ed.2d 186 (1971); *Moss v. Stamford Board of Education,* 356 F.Supp. 675, 685–686 (D. Conn. 1973). The closing of Ficklin is fully justified by legitimate school board and student interests and necessity; and the decision was made after a consideration of relevant factors.

### (d) Cora Kelly School

The reasons for the termination of operations at Cora Kelly have been set forth previously. The plaintiffs do not question the legitimacy of those reasons. What the plaintiffs request insofar as Cora Kelly is concerned is a direction to the defendant to reopen Cora Kelly upon completion of the flood control project. The Board, as indicated, has not committed itself one way or the other on reopening the school. It has

said that it will examine the situation upon substantial completion of the flood control project. It would be improper for the Court, in advance of that time, to assume the Board will make an improper decision, i.e., one that has as its result a harsher impact through bussing on black elementary students than on white and that is not justified by legitimate school board and student interests after a consideration of all the relevant factors. There is as yet no controversy on this issue and for the Court to anticipate one would be premature.

The Board has leased the Cora Kelly school site to the City of Alexandria and certain activities, including operation of a minor league baseball team, are being carried on under the direction or with the permission of the City. The Board's lease with the City is terminable on 90 days' notice, and will not affect the Board's decision whether to reopen Cora Kelly as an elementary school.

*   *   *   *   *   *

The plaintiffs have asked for an award of attorney's fees pursuant to 42 U.S.C. § 1988, which provides, in pertinent part, that:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. 42 U.S.C. § 1988 (1976).

The defendant, not the plaintiffs, has prevailed. The standard, however, to be used in determining whether to assess against the plaintiffs their opponent's attorney's fees is governed by *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54

L.Ed.2d 648 (1978). There, in considering identical language, albeit in a Title VII [Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k)] context, the Court found such an assessment warranted only if this "court finds that [the plaintiffs'] claim was frivolous, unreasonable, or groundless, or that the plaintiff[s] continued to litigate after it clearly became so." 434 U.S. at 422, 98 S.Ct. at 701. No such quality or conduct is found here and no allowance of attorney's fees for the defendant will be made.

In sum, the Court concludes that there has been shown no impact through bussing falling more harshly on black elementary students than upon white as a result of any policy or action of the defendant;[6] that even if there has been shown such an impact, that the action of the Board in closing those schools is fully justified by legitimate school board and student interests, after a consideration of all the relevant factors and uninfluenced by any improper racial motive to close black schools in neighborhoods where the majority of the residents are black; the prayers for relief will be denied; and the complaint dismissed.

---

**6.** There is no suggestion here that the closing of one of the schools in question has resulted in overcrowding of another school, or that the decisions of the Board were motivated by a fear that use of a closed school would lead whites to withdraw from the public system. *Lee v. Macon County Board of Education*, 448 F.2d 746, 754 (5th Cir. 1971).