Leon W. BRADLEY, Jr., et al., Plaintiffs,

v.

The PINELLAS COUNTY SCHOOL BOARD, et al., Defendants,

Dan E. Schramek and Malcolm Flakes, Jr., Applicants for Intervention.

No. 64–98–Civ–T–23B.

United States District Court, M.D. Florida, Tampa Division.

Sept. 7, 1994.

Thomas C. MacDonald, Jr., Shackleford, Farrior, Stallings & Evans, P.A., Tampa, FL, Norman J. Chachkin, New York City, Enrique Escarraz, III, Law Office of Enrique Escarraz III, St. Petersburg, FL, Warren H. Dawson, Dawson & Griffin, P.A., Tampa, FL, Roger W. Plata, Roger W. Plata, P.A., St. Petersburg, FL, for plaintiffs Leon W. Bradley, Jr., Leon W. Bradley, Sr., Janice Faye Rutledge, Spencer Clayton Rutledge, Charles Rutledge, Joyce Maria Green, Magnolia Vilydia Green, Alexander Green, Roland D. Devine, Sam Devine, Sylvia Jean Barton, Emma Lee Barton.

John W. Bowen, Pinellas County School Board, Largo, FL, for defendant Board of Public Instruction of Pinellas County.

Dyril L. Flanagan, Law Office of Dyril L. Flanagan, St. Petersburg, FL, Thomas W.

Reese, Law Office of Thomas W. Reese, St. Petersburg, FL, for movants Dan E. Schramek, Marcus D. Griffith.

Thomas W. Reese, Law Office of Thomas W. Reese, St. Petersburg, FL, for movant Malcolm (Mack) Flakes, Jr.

## ORDER DENYING MOTION TO INTERVENE

MERRYDAY, District Judge.

This case is before the court on remand from the Eleventh Circuit to conduct an evidentiary hearing on Dan E. Schramek's and Malcolm Flakes, Jr.'s [1] motions to intervene as plaintiffs in this action to desegregate the public schools of Pinellas County. The court conducted an evidentiary hearing on March 28, 1994. Upon consideration of the papers submitted, the mandate from the Eleventh Circuit, the argument of counsel, and evidence submitted, this court concludes, to the extent stated below, that neither applicant is presently entitled to intervene.

### I. PROCEDURAL HISTORY

On July 30, 1990, Dan E. Schramek and Marcus D. Griffith filed a "Motion for Intervention." The court considered the motion and concluded, on the papers submitted, that the proposed intervenors were seeking to modify the desegregation plan and related court orders, rather than to assert rights established by the orders. Therefore, on March 8, 1991, the court denied the motion to intervene.

*Bradley v. Pinellas County School Board,* 961 F.2d 1554, 1558 (11th Cir.1992), reversed the court's decision and remanded the case for an evidentiary hearing on the motion to intervene. Pursuant to the mandate, this court conducted an evidentiary hearing on March 28, 1994.[2] Before the hearing, Griffith filed a notice of voluntary dismissal of his motion to intervene on the ground that he had relocated his residence to Arizona. Con-

sequently, on February 11, 1994, the court denied Griffith's motion as moot. On February 8, 1994, Malcolm Flakes, Jr., (represented by the same counsel as Schramek and Griffith) moved to intervene and for other relief. By agreement of counsel and with the approval of the court, Flakes participated in the evidentiary hearing, the scope of which was limited to those issues common to the July 30, 1990, motion for intervention submitted by Griffith and Schramek.

Schramek and Griffith initially sought to intervene pursuant to Rule 24(a) and (b) as both individuals and as members of a class of "all residents of Pinellas County, Florida, who are subject to ad valorem taxes and who have their minor children attending or have the right to attend public schools in Pinellas County." The parties have stipulated that the court will not address the issue of class certification unless and until the court finds Schramek entitled to intervene. Flakes seeks intervention pursuant to both Rule 24 and Rule 23(d). Flakes asserts that as a member of the certified class he is entitled to intervene to ensure that representation of the class is "fair and adequate" and to present claims of the class that are not currently addressed. Flakes argues for intervention under Rule 23(d) and asserts arguments that were not advanced during the July 30, 1990, motion. Therefore, in accord with this court's order and the agreement of the parties, these issues are not before the court for disposition at this time.

### II. DISCUSSION

This case was filed in 1964 to desegregate the public schools of Pinellas County. On May 18, 1977, the court certified the suit as a class action brought "on behalf of all Negro children eligible to attend the public schools of Pinellas County, Florida, from the inception of this cause, currently, and in the future." On July 23, 1971, the court approved a comprehensive student assignment plan.

---

1. On February 8, 1994, one of the applicants for intervention, Marcus D. Griffith, dismissed his motion to intervene. Malcolm Flakes, Jr., moved to intervene and the Court permitted, with the agreement of counsel, Mr. Flakes to participate, in substitution for Mr. Griffith, in the proceedings for intervention.

2. The Court initially set this case for hearing on July 31, 1992. This date was continued at the request of the movants so that the movants could conduct discovery and prepare their evidence.

A week later, upon motion of the defendants, the court amended its judgment to permit the school district to make changes in the plan without securing prior judicial approval so long as the plan maintained "a 30 percent maximum black student ratio in any school and a minimum black student ratio that varied by grade level but was the same throughout the county."

Subsequently, on May 18, 1977, the court approved the parties' stipulation to modify further its outstanding orders so as to divide the county into two parts, an "up county" (hereafter "north county") and "down county" (hereafter "south county") area. The 30% maximum ratio for school enrollments continued to apply throughout the county, but the order established separate minimum ratios equal to one-half the total enrollment ratio (at the appropriate grade level) in each area.[3]

The proposed intervenors contend that they are entitled to intervene to seek a remedy for alleged violations of this court's orders by the school board, violations which frustrate the goal of achieving a unitary school system and which plaintiffs have assertedly refused to bring to the court's attention. The movants claim that the school board discriminates against black students by "causing the burden of busing, which is necessary to maintain the court-ordered maximum and minimum black student ratios in some schools, to fall on black students and not white students," *Bradley* 961 F.2d at 1555. Specifically, the movants allege that the school board accomplishes this discrimination in three ways:

(1) by "fail[ing] to adhere to state student capacity figures [and] ... manipulat[ing] these figures" in a manner which violates the decrees of this Court;

(2) by permitting "white students in integrated neighborhoods ... to attend their neighborhood schools by applying for special attendance permits, applications for which are mailed to parents of white students but not to parents of black students. The result is that black students who live in integrated neighborhoods are being bused out of their neighborhoods to attend schools while their white neighbors are allowed to attend neighborhood schools."; and

(3) by "provid[ing] inferior and inadequate school facilities in the integrated neighborhoods in the south part of the county; build[ing] and expand[ing] facilities in all-white neighborhoods in the north part of the county; and address[ing] the overcrowding of schools in integrated neighborhoods by busing black students away from their neighborhoods, using the desegregation order as justification." *Bradley* at 1555–56.

On appeal the Eleventh Circuit determined that the proposed intervenors "have articulated an interest in a desegregated school system that justifies intervention" *Id.* at 1557. The court concluded that the proposed intervenors are entitled to intervene in this action if they can substantiate these three specific allegations of the school board's discrimination against black students. *Id.* at 1557.[4] The burden is on the movants

---

3. The stipulation also sought to ameliorate the problem created when a school's actual enrollment differed from what had been anticipated and exceeded the 30% maximum. It provided, *inter alia*, that the district would not be required to reassign students after the beginning of the first or second school year in which a school exceeded the maximum ratio, if the board had made a good faith effort to zone the school below the maximum. It also articulated a set of "principles" to be "applied in making good-faith projections," and included the following language:
  5. The following shall be applied in implementing the above: ...
    b. When it is projected that the ratio may be over 30% and the school is under capacity, the white area should be expanded to bring the ratio below 30% allowing for a margin of error

without a further rezoning after school begins. On the other hand, when the school is projected to be over 30% and is also over capacity, black students should be projected out on the same basis.
October 27, 1976 Stipulation of the Parties, at 3–4 [attached to *Order of Amendment to Final Order and Amended Judgment*, May 18, 1977.]

4. To intervene under Rule 24 in a school desegregation action as a matter of right the proposed intervenor must demonstrate a "legally protectable interest" in the litigation which is inadequately represented by the parties. *United States v. Georgia*, 19 F.3d 1388, 1393 (11th Cir.1994). Notwithstanding the Eleventh Circuit's conclusion in *Bradley v. Pinellas County School Board*, 961 F.2d 1554 (1992), that the movants are enti-

to establish that the school board is acting contrary to the establishment of a desegregated or unitary school system. *Id.* at 1558. The proposed intervenors must also show that their interests are not being adequately protected by the existing parties. Rule 24, Fed.R.Civ.P.; *See also Graves v. Walton County Bd. of Educ.,* 686 F.2d 1135, 1140–41 (5th Cir.1982). That is, the issues raised by the intervenors must not have been raised by the existing parties or known to the court and the existing parties prior to the motion to intervene. *Graves,* 686 F.2d at 1141. An extended period during which discovery was conducted preceded the evidentiary hearing which this court conducted on March 28, 1994. Therefore, the court finds that the matter is ripe for determination at this time.

### A. Pinellas County Busing for Desegregation Purposes

■ The school board buses a total of 14,708 students for desegregation purposes, 9,108 of whom are black students.[5] Although black students make up less than 18% of the total Pinellas County public school enroll-

ment (less than 25% of all pupils in the south county area and less than 10% in the north county area), approximately 62% of all pupils transported for desegregation are black.[6] Approximately 54% of the total black student population is bused for desegregation purposes and only 7.4% of the total white student population is bused for desegregation purposes.[7] The proposed intervenors contend that the school board's busing policy violates the 1971 desegregation order which provides for transportation "on a non-segregated and otherwise nondiscriminatory basis."[8] The proposed intervenors assert that the school board's discriminatory policy is evidenced by the school board's failure to construct new elementary and middle schools in the urban and predominately black areas in south St. Petersburg, which would allegedly reduce the number of black students bused for desegregation purposes.[9]

While the busing figures demonstrate that the black students bear most of the burden of busing to achieve desegregated schools, the numbers alone do not establish a racially discriminatory busing policy. The federal

---

tled to intervene if they can "substantiate" their allegations of discriminatory conduct, the evidence before this court suggests that the intervenors, most particularly Schramek, may not otherwise have legally cognizable interests in the litigation. For example, the courts have recognized that parents, teachers, students and parent organizations have a sufficient interest in school desegregation to claim a potential right to intervene. *See United States v. Perry County Bd. of Educ.,* 567 F.2d 277, 279 (5th Cir.1978); *Pate v. Dade County School Board,* 588 F.2d 501, 503 (5th Cir.), *cert. denied,* 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979); *Bradley v. Milliken,* 828 F.2d 1186, 1192 (6th Cir.1987). As of September 1994, the time of this writing, Schramek no longer has a child enrolled in the Pinellas County school system. In addition, Schramek states the "primary factor" that motivated him to seek intervention was a dispute over the policy of issuing special attendance permits at Lakewood High School (TR 25). Although Schramek states that his purpose in seeking intervention is to enforce the court order (TR 35, 37), Schramek also maintains that he "want[s] to enforce those provisions of the court order that are important to [his] interests in the community" (TR 38) and that he "would be able to selectively seek enforcement of the court order if [he] were granted intervenor status" (TR 40). To intervene in a school desegregation case, the movant must seek to enforce the court order for the purpose of establishing a unitary school system. *Pate v.*

*Dade County School Board,* 588 F.2d 501, 503 (5th Cir.), *cert. denied,* 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979). The intervenor must seek to enforce desegregation of the school system as a whole rather than to protect individual interests or to object to discrete issues of school policy. *See Bradley v. Pinellas County School Board,* 961 F.2d 1554, 1557 n. 6 (11th Cir.1992); *See also, United States v. Georgia,* 19 F.3d 1388 (11th Cir.1994). Schramek's testimony suggests that he may not have a sufficient interest in the desegregation of the school system as a whole to entitle him to intervene. However, to comply with the Eleventh Circuit's mandate, the court shall examine the evidence submitted in support of the proposed intervenors' allegations in the July 30, 1990, motion of the school board's discriminatory conduct.

5. Proposed Intervenors' Exhibit ("IX") 5.

6. Defendant's Exhibit ("DX") 7; IX 5; and page 131 of the transcript of the March 28, 1994, hearing ("TR").

7. TR p. 131; IX 5.

8. "Flakes and Schramek's Post Hearing Memorandum of Law," at 13–14 ¶ 50.

9. "Flakes and Schramek's Post Hearing Memorandum of Law," p. 14

courts generally recognize that busing burdens may be unequal and the courts will not infer discriminatory busing policies unless one group bears the entire burden of busing for desegregation purposes.[10] In Pinellas County substantial numbers of both black *and* white students are transported for desegregation purposes.[11]

The school board has offered a number of nondiscriminatory reasons for its failure to construct additional school facilities in south St. Petersburg. Construction and expansion is constrained by the cost and scarcity of buildable land in the south county area and the expense of eminent domain proceedings.[12] Even if sufficient land was affordable and available, the number of students bused, and consequently the costs of transportation, would increase to accommodate the court-ordered student population ratios.[13]

Despite these constraints, the school board anticipates enlarging at least two and possibly three of the existing elementary schools in the south County area.[14] Furthermore, the school board recognizes that "[b]using for desegregation purposes in Pinellas County does and has disparately affected black students."[15] The school board has participated

in nationwide studies of this issue[16] and is working on developing solutions to the problem that promote a unitary school system. For example, the school board has established a number of "magnet" schools to provide more choice for both black and white students and, in some instances, to permit children who would otherwise be zoned out of the neighborhood to attend schools close to their homes.[17]

The evidence, therefore, does not show that the disproportionate busing violates the court order or that the parties are unaware of or refusing to address the problem. Consequently, the movants have failed to demonstrate a legally cognizable interest in the busing policy that would entitle them to intervene in this action.

**B. School Capacity Manipulation**

Generally, when the black student population ratio at a Pinellas County school exceeds 30% and the school is under capacity, the May 18, 1977, stipulation requires the school board to bring in additional white students; if the school is over capacity, black students should be reassigned.[18] The proposed intervenors maintain that the school board manipulates school capacity figures to

**10.** *See, e.g., Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 9, 32, 91 S.Ct. 1267, 1272–1273, 1284, 28 L.Ed.2d 554 (1971) (affirming order approving plan utilizing one-way busing of black students to outlying junior and senior high schools); *United States v. Board of School Commissioners,* 637 F.2d 1101, 1114 (7th Cir.) (approving plan because "it cannot be said that only minority students will bear the burden of the remedy imposed by the court"), *cert. denied,* 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980); *Fitzpatrick v. Board of Education,* 578 F.2d 858, 861 (10th Cir.1978) ("entire or primary burden"); *Hart v. Community School Board of Education,* 512 F.2d 37, 53 (2d Cir.1975) (61% of students bused under plan were black; court approved plan with comment that "[a 'somewhat heavier burden' has to fall somewhere, either on white or minority students as a class"); *Higgins v. Board of Education,* 508 F.2d 779, 794 (6th Cir.1974) (school authorities would have abused their discretion in fashioning voluntary plan "if they had placed all burdens and inconveniences on a single portion of the population"). As now Chief Judge Newman recognized, even under a fairly drawn desegregation plan, a greater proportion of minority students must be reassigned than of white pupils. *See Moss v. Stamford Board of Education,* 356 F.Supp. 675, 680–84 (D.Conn.1973).

**11.** *E.g.,* IX 5 (9108 black and 5600 non-black pupils transported for desegregation); DX 33; IX 1–3 Nos. 8–16, 100; TR 131, 140.

**12.** TR 212–13; TR 280–88.

**13.** TR 299–301.

**14.** TR 212; TR 263.

**15.** "Defendant School Board's Proposed Findings of Fact and Supporting Memorandum of Law," p. 6, para. 27; TR 254.

**16.** TR 255–56.

**17.** TR 254. Mr. Flakes' children currently attend a "magnet" school and a "fundamental school" as part of the public school program in the south St. Petersburg area. His children thereby attend schools that are closer to home than the elementary school for which they are zoned (TR 75). For one child, the distance to school is less than two miles (TR 79).

**18.** *See supra,* note 3.

avoid busing white students and to require busing of black students to maintain the required ratios. The movants assert that this practice occurs in the schools located within their "integrated" neighborhood.

The proposed intervenors reside within a racially integrated area of St. Petersburg, Florida, south of 30th Avenue South, which includes the area known as Lakewood Estates.[19] Flakes described his neighborhood's racial composition by stating that "I guess we have gone through some transition over recent years, but we're about 50/50 black and white in the neighborhood."[20] Within the area south of 30th Avenue South and east of 49th Street are located the Lakewood, Maximo, Bay Vista, and Bay Point Elementary Schools, Bay Point Middle School, and Lakewood High School.[21] Immediately to the north of this area is the part of St. Petersburg within which most of the county's black population resides, between Central Avenue and 30th Avenue South, and east of 49th Street.[22]

The events that prompted the July 30, 1990, motion for intervention relate to boundary changes and student reassignments in the 1989–90 and 1990–91 school years affecting Bay Point Middle School and Lakewood High School.[23] For several years in the late 1980's, the schools exceeded the 30% maximum ratio.[24] Lakewood High School was rezoned three times within seven years because the proportion of black high school students in the area in south St. Petersburg around the school had been growing.[25] After studying the situation for more than a year, the school administration determined that the strategy of reassigning a sufficient number of additional white residential areas to Lakewood to bring its enrollment ratio below the maximum (an approach which had up to that time not succeeded in stabilizing the school's enrollment beneath the maximum) would cause the school to exceed its capacity, thus triggering the reassignment of black residential areas away from the school.[26] The school board therefore adopted a three-part solution to comply with the court order: 1) to reassign some black residential areas from Lakewood;[27] 2) to create the first high school satellite zone to add white students to Lakewood; and 3) to establish a magnet CAT[28] program to attract additional white students to Lakewood on a voluntary basis.[29]

These steps have been successful. Since 1990, Lakewood has not been rezoned and enrollment has remained under the 30% maximum.[30] The movants contend, however, that the school board's actions violate the requirement under the May 18, 1977, stipulation that the school board make zoning changes based on "good faith projections" of student population.[31] Specifically, the movants oppose 1) the school board's use of school population projections that include black students bused to the school, 2) the conversion of classrooms to resource rooms that resulted in reduced capacity at Lakewood High School, 3) the use of a "program" capacity method of determining school capac-

19.  TR 22; TR 59.

20.  TR 59.

21.  DX 1; IX 1–B.

22.  TR 223; TR 299; *cf.* TR 213–14 (Perkins Elementary and 16th Street Middle School in predominantly black neighborhoods; Lakewood Elementary in integrated neighborhood); DX 8, 10.

23.  *See* Schramek's and Griffith's "Motion for Intervention" filed on July 30, 1990; *See also*, IX 1, Nos. 3–16, 99–101, 110.

24.  TR 204, 220.

25.  TR 220, 222.

26.  TR 221, 225.

27.  The areas reassigned away from Lakewood included apartment complexes that had been identified by the school's Parent Advisory Committee as being among the false addresses frequently given by non-resident Lakewood pupils whose enrollment contributed to the school's failure to remain within the maximum ratio. TR 207–08.

28.  The acronym stands for Computer Assisted Technology, TR 224.

29.  TR 221–22, 224–25.

30.  TR 250, 296–97.

31.  *See supra*, note 3.

ity rather than use of the "FISH" [32] capacity determined by the state, 4) the reduction in the utilization rate at Lakewood High School from 95% to 90%, and 5) the busing of black students out of Bay Point Elementary when the school was under capacity in 1988.

The proposed intervenors have failed to substantiate their allegations of improper student capacity manipulation at Lakewood High School. Although the proposed intervenors suggest that FISH capacity is the relevant measure of school capacity, neither the May 18, 1977, order nor the underlying stipulation defines school "capacity" as FISH capacity. The school board admits that it does not use "FISH" capacity alone to determine capacity. Rather, the board calculates "program capacity" which takes into account the usage of classroom space, thereby adjusting for a reduced class sizes for certain "specialized" classes, such as advanced classes and classes for students with a specific learning disability.[33] The school board uses the same program capacity method to determine the capacity of all of the Pinellas County schools.[34]

In 1988, the high school populations in Pinellas County were declining. As reflected in the 1988 Educational Plant Survey [35] at every Pinellas County High School the survey team recommended the conversion of classrooms into resource rooms, which resulted in the reduction of FISH capacity at each Pinellas County High School.[36] Similar changes in capacity took place throughout the state.[37] At Lakewood High School, the

survey team recommended a 90% utilization rate, rather than the usual factor of 95%,[38] to accommodate special facility needs.[39] The special facility needs most likely included the CAT program, which at the time the survey was completed was to be implemented without construction of additional classroom space.[40] The survey team that recommended the changes is comprised of individuals from school districts outside of Pinellas County and from the State Department of Education. No Pinellas County employees serve on the survey team.[41] Therefore, the evidence does not support the movants' allegation that the school board manipulated the 1988 and later capacity calculations and reductions at Lakewood High School to discriminate against black students.

The movants' remaining allegations of capacity manipulation are also unsubstantiated. The movants claim that the 1989–91 busing of black students from Bay Point Elementary was discriminatory because the school was under capacity. In 1988 Bay Point was rezoned resulting in the transfer of some black students out of the school and the transfer of some white students into the school. In 1989, the board rejected a plan proposed by the NAACP to further rezone additional black students out of the school and additional white students into the school.[42] The same considerations that affected the 1990 Lakewood rezoning applied to Bay Point Middle School and the evidence does not show that the rezoning violated the court orders.[43]

---

32. The acronym stands for Florida Inventory of School Houses. A building's FISH capacity is basically determined by the size and configuration of its rooms and the application of formulas devised by the State Department of Education. TR 110. FISH capacity can change as a result of renovation, remodeling or new construction recommended by the periodic Plant Surveys, or by reclassification of classrooms for intermittent use as resource rooms, again at the recommendation of the Plant Survey teams or with the approval of the Department of Education. TR 111, 119–20.

33. TR 87, 135–36; DX 33.

34. TR 136.

35. IX 1A.

36. IX 1A, p. 385; TR 137.

37. TR 138.

38. The utilization factors that are recommended by the Florida State Department of Education are listed in IX 1A, p. 8.

39. IX 1A.

40. TR 124.

41. TR 120. In recommending resource rooms, the survey team may consider information from the school district about specialized classes.

42. TR 297–98; IX 1 & 3, question number 8.

43. Even if the school board had adopted the rezoning plan proposed by the NAACP and additional white students had been rezoned to the

Finally, the movants argue that the school board manipulates capacity by including the number of students bused for desegregation purposes in student population projections. The intervenors maintain that "[t]his manipulation allows the school board to bus black students out of neighborhood schools to decrease the black student ratio, rather than requiring it to bus white students to south St. Petersburg schools to adjust the ratios."[44] The school board admits that student population projections are based on the number of students currently attending a school, which number includes all students bused to the school for desegregation purposes. The school board cannot create an artificial enrollment number based on the students "residing in the area," as suggested by the movants, without first defining a school's "area." If undertaken, this process of defining a school's "area" would no doubt be protracted and would likely result in projections of little value, assuming that the school board would continue to be bound to the desegregation requirements of the court order. Furthermore, the current procedures for projecting the school populations do not necessarily reflect a policy of perpetually busing more blacks than whites. The 1977

order and stipulation of the parties articulate the parties' goal of not disrupting integrated neighborhoods in the desegregation process. The minutes of the school board meetings that were introduced at the hearing reflect the school board's good faith efforts to implement that goal. The evidence also shows that the school board is aware of the unequal busing burdens and is exploring ways to address the problem.

The July 2, 1971, decree and subsequent orders of this court give the local authorities considerable flexibility to implement the desegregation requirements. The parties have worked effectively to carry out these decrees in the face of transition in neighborhoods such as Flakes' and other practical problems.[45] There is no evidence that the defendants are manipulating capacity to perpetuate discriminatory busing.

### C. Special Attendance Permits

A special attendance permit allows a student to attend a school other than the school to which the student is assigned. The school board grants special attendance permits if the transfer is justified by medical or curricular needs, or to avoid hardship.[46] If the school is being closely monitored for

school, Bay Point Middle School's enrollment would have been approximately 28.7% black, compared to 23.5% under the plan adopted by the Board. *See* IX 1, question 13; IX 1–I. In light of the increase in the proportion of minority students in this area of the system in the preceding years it was not unreasonable or discriminatory for the Board to select the more effective option. Moreover, the 1989–90 Bay Point Middle School reassignments did send additional white students to the school as well as reassign some white and some black students away from the school. IX 1, Nos. 8, 16; IX 1–I.

44. "Flakes and Schramek's Post Hearing Memorandum of Law" at 18.

45. For example, in 1988 the parties stipulated that Lakewood High School would be permitted to remain out of compliance with the maximum ratio for another school year while creation of a magnet program was explored. In the same stipulation, which was approved and adopted by this Court on June 2, 1988, the parties agreed that the Board would have two years to implement rezoning to bring Lakewood's enrollment within the maximum and that rezoning would affect only incoming ninth-grade students, and students moving into the rezoned area. The par-

ties sought "to achieve as much stability as possible for students and assist them in obtaining a better education, while at the same time complying with the original court order." Predominantly black residential areas were reassigned from Lakewood in the 1989–90 and 1990–91 school years in accordance with this stipulation. IX 1–3, questions 99–100. The Court has already found such reassignments to be consistent with the May, 1977 Order.

The 1990–91 rezoning, however, applied to incoming ninth- *and* tenth-grade students. The movants allege that the inclusion of the tenth graders violated the 1988 Order and stipulation and was discriminatory. The parties maintain, and the evidence supports, that the twin goals of the 1988 stipulation, effectiveness within two years and stability, could not have been achieved by limiting rezoning to ninth-grade students. DX 20; TR 235–41. Therefore, while the rezoning of tenth-grade students may technically have violated the 1988 stipulation, in the absence of a showing of a pattern of serious violations of its Orders the Court does not find that the violation "articulates the means by which the school board is frustrating the goal of achieving a unitary school system." *Bradley*, 961 F.2d at 1557–58.

46. IX 1–L.

compliance with the court-ordered ratios or is out of compliance with the ratios and the transfer would negatively impact the school's compliance, the school will only consider transfers for medical reasons.[47]

The court order of August 6, 1970, requires the school board to permit student transfers that assist the desegregation of the schools.[48] During the 1980's the school board directed the staff to grant requests for special attendance permits whenever doing so would assist in meeting the enrollment ratio requirements of the court orders.[49]

The proposed intervenors allege that in 1990 the school board granted, on a discriminatory basis, special attendance permits to white students who were zoned out of Lakewood High School. The Eleventh Circuit described the movants' position as follows:

> [T]he proposed intervenors allege that white students in integrated neighborhoods are allowed to attend their neighborhood schools by applying for special attendance permits, applications for which are mailed to parents of white students but not to parents of black students. The result is that black students who live in integrated neighborhoods are being bused out of their neighborhoods to attend schools while their white neighbors are allowed to attend neighborhood schools.

*Bradley v. Pinellas County School Bd.*, 961 F.2d 1554, 1555 (11th Cir.1992). The evidence shows that in one instance, in connection with the rezoning efforts of Lakewood High School which had been out of compliance with the court-ordered ratios for a number of years, the school superintendent sent letters to the parents of the white students residing in areas that had been rezoned away from the school. The letters advised these parents that transfer of their children was counter-productive to the school's efforts to bring Lakewood High School into compliance with the court orders and invited them to

apply for a special attendance permit if they wished their child to remain at Lakewood. Each letter enclosed a permit application which was complete except for a parent's signature and which gave as the reason for the request, "counter-productive to rezoning thru court order."

Only parents of white students received the letter and the form even though special attendance permits for other reasons were available to black as well as white students.[50] This racially selective invitation to apply for special attendance permits was deeply offensive to parents in the Lakewood Estates area including Schramek and Flakes, and the court considers it to have been both unnecessary and decidedly unwise. However, this is the only documented instance of such conduct shown by the applicants, and the court accepts Superintendent Hinesley's statements that it was aberrational. In particular, Dr. Hinesley emphasized that the district now provides notification in a nondiscriminatory manner to all parents of the availability of special attendance permits. This episodic instance is insufficient to justify intervention, particularly in light of Schramek's decision to accept the invitation to obtain the special attendance permit for his daughter.[51]

### D. Adequacy of School Facilities in South County

■ The court reaches, finally, the movants' allegation "that the school board provides inferior and inadequate school facilities in the integrated neighborhoods in the south part of the county,"[52] and finds, as in all of the other allegations, that the movants have failed to prove that they are entitled to intervene.

The movants offered no credible evidence to support this allegation. When asked on cross-examination to identify particular inadequacies of the schools in integrated neighborhoods, the movant Schramek was unable

---

47. DX 4; TR 93–95.

48. The Court ordered "[t]hat the school district shall permit any student attending a school in which his race is in the majority to choose to attend another school where his race is in the minority."

49. TR 257; *see* TR 89–90.

50. DX 5, 33; TR 103, 107, 306–07.

51. *See* TR 28–29, 50–51, 91–93.

52. *Bradley*, 961 F.2d at 1555–56.

to identify even one.[53] The evidence obtained from the parents with children attending schools in the integrated neighborhoods of the south county area shows that the parents were generally satisfied with the quality of the education their children received. For example, Schramek testified that, given the option to transfer to another school, his daughters chose to remain at Lakewood High School, the school Schramek asserts is particularly inadequate.[54] One of Schramek's daughters participated in the girls' soccer program at Lakewood High School, a program for which the school has achieved a number of state and county distinctions and awards.[55] Cesar Alvarez, a witness for the movants, stated that his children, who attended schools within the integrated neighborhoods of the south county area, received a number of distinctions while in the school system and one son received a partial scholarship to Harvard University.[56] Larry J. Williams, a witness for the school board, stated that he has five children who have attended Lakewood High School and that his "overall view of Lakewood High School is an excellent high school." [57]

The movant Flakes asserted his concerns regarding Bay Point computer magnet school, an elementary school within an integrated neighborhood in the south county area. Flakes stated that his son attended Bay Point in the 1993–94 school year, the first year the magnet school was in operation. Flakes believes that his son lost at least one semester of meaningful instruction because the teachers were not adequately trained, there were not enough computers to accommodate the students, and the school experienced a number of technical difficulties with the set up of the computers.[58] The court makes no finding regarding the adequacy of the computers or other equipment at Bay Point Elementary.[59] However, even accepting that the school was not properly equipped or funded, it is too soon to determine whether the facilities are "inadequate" or whether the school's difficulties evidence discrimination against integrated schools. Flakes apparently has not directly contacted the school officials or the plaintiffs' counsel to voice his concerns.[60] Given the newness of the program, it is likely that the school board, if it is aware of these problems, may not have had adequate time to respond to the problems. Therefore, there is no evidence that the shortcomings of the Bay Point computer program, as identified by Flakes, result from discriminatory policies.[61]

■ Further, although the movants claim that the school system discriminates against integrated neighborhoods, their presentation focused on the heavily black residential area north of 30th Avenue South, rather than their own neighborhoods. They suggest first that additional schools should have been constructed in this area to replace capacity lost when the Roser Park and Wildwood Elementary schools were closed because of their age and condition. Former Superintendent Scott Rose testified that there was adequate capacity at adjacent schools in satisfactory condition to house the students who formerly attended these facilities, at the time of their

53. TR 47–48.

54. TR 47–52.

55. TR 36.

56. TR 175. Although Mr. Alvarez asserted that over the years he was aware of a few complaints by teachers of the lack of adequate classroom space at Lakewood High School, no evidence was presented to establish that these problems remain or that they were unique to schools in integrated neighborhoods.

57. TR 208.

58. TR 70–72.

59. At the hearing, the school board objected to the introduction of testimony regarding the adequacy of computers or other equipment at the schools because this issue was not raised in the July 30, 1990, motion for intervention. The Court agreed not to consider, at this time, the testimony regarding the computers for the purpose of determining the adequacy of school "facilities."

60. TR 82.

61. On the contrary, that the program is offered in the south county area suggests that the school board is seeking to provide a variety of educational opportunities to students throughout the county.

closing.[62] In light of this adequate capacity, "[t]he goal of achieving a fair and reasonably unburdensome desegregation plan does not oblige a school board to maintain or rehabilitate an unsafe and physically obsolescent school ..." *Mitchell v. McCunney*, 651 F.2d 183, 189 (3d Cir.1981). In addition, reconstruction that does not further the goal of achieving a unitary school system would violate the legal principles on which the court's desegregation order is based.

The movants assert that the schools in the south St. Petersburg area are inferior and receive lower quality ratings than schools in the north county area. The evidence shows, however, that schools in predominantly white areas have received the lowest quality rating and that renovations are occurring in the south St. Petersburg area to improve the schools with low ratings.[63]

The movants also object to new construction in the north county area, arguing that north county residents receive the benefit not only of a new facility but also of a one-year increase in the capital improvements budget for the new school that enables the

school to purchase better equipment. The school board admits to building in North Pinellas to respond to population increases in the area.[64] The decisions to construct, renovate, add on, close, or otherwise alter the physical facility are based on the recommendations of the State Department of Education and no project may be undertaken without the permission of the Department.[65] Superintendent Hinesley testified that the capital expenditures overall have been comparable, if not greater, in the south county area where the schools have required extensive renovation.[66] From this evidence, the court finds no basis for inferring discrimination in capital expenditures.[67] Further, the movants' objection to the construction of new facilities in the north county does not entitle them to intervene.

For the foregoing reasons, the court finds that the movants have failed to substantiate each of their allegations. The evidence does not show that the parties are thwarting the goal of achieving a unitary school system by manipulating school capacity, by granting

---

**62.** TR 231–233.

**63.** The movants claim that in the 1988 Educational Plant Survey, "three of the eight elementary schools in the south St. Petersburg [area] are classified C–2" and that "No C–2 schools exist except in the predominately black neighborhoods." *Post Hearing Memorandum of Law* at 15. The C–2 schools included Fairmount, Lakeview, and Lakewood Elementary. The 1992 Educational Plant survey shows that Fairmount and Lakewood Elementary have been upgraded to C–1. More significant is the fact that the 1988 Survey gave *five* elementary schools in white "neighborhoods" even lower C–3 or C–6 ratings (indicating a need for immediate discontinuance, *see* IX 1–A, at 9–10). These schools included North Ward in Clearwater, Norwood in St. Petersburg, Oldsmar, South Ward in Clearwater, and North Ward in St. Petersburg. Dr. Hinesley testified, without contradiction, that the school system is "still doing renovations of older facilities in St. Petersburg, in the general area.," TR 210.

**64.** For example, in 1988, Lake St. George Elementary opened with a school population of 770 and grew to 981 in 1990. Highland Lakes opened nearby in 1991 with a population of 665. By 1993–94, the school population increased to 1,031 students.

**65.** TR 228.

**66.** TR 261–262. *See also*, DX 31, 17 & 18.

**67.** The Court does not find that the data introduced by the movants is reliable. IX 8–19 graphically displays numbers of schools, numbers of new schools, and amounts of capital expenditure made by the school district, in each of five different groups of census tracts. Each group of census tracts differs in racial composition as reported in the 1980 U.S. Census (though the variation is irregular: less than 2% black, 2%–10% black, 10%–30% black, 30%–50% black, and more than 50% black). No account is taken of any measures of need for capital spending (such as physical damage from natural disasters, etc.), of expenditures for major renovations rather than repair or replacement of facilities, or of variations in the geographic size or population density of individual census tracts.

Inasmuch as the movants were also unaware whether school attendance boundaries parallel census tracts (see TR 185–87), the conclusions to be drawn from these arrays are unclear. Moreover, while the majority of spending and construction was on facilities located in census tracts less than 2% black, no inference of discrimination can be drawn from this fact because in 1980, 131 of 171 census tracts were less than 2% black, 15 were between 2% and 10% black, 10 between 10% and 30% black, and only 5 between 30% and 50% black. IX 1–N.

special attendance permits on a discriminatory basis, or by maintaining inadequate facilities in integrated neighborhoods.

Accordingly, for reasons which surely were obvious to Judge William Terrell Hodges when he initially denied this motion without the necessity of a hearing, Schramek's motion for intervention is **DENIED WITH PREJUDICE**.[68]  Schramek's testimony is unworthy of belief to the extent that his aspirations are at issue.  His assertions on other issues are implausible and without material support.  Flakes' motion for intervention is likewise **DENIED** insofar as it relies upon the allegations made in Schramek's motions.  If Flakes desires to pursue the issues of his motion for intervention that were not addressed in this order, Flakes shall file a motion no later than September 30, 1994,

**68.** The proposed intervenor Daniel Schramek frequently has attempted to intervene in legal proceedings in bad faith and in disregard of the rights and interests of others.  In 1991, Schramek was "found guilty by a jury and convicted of forgery, uttering, and notary fraud because he forged the signature of another individual on a document and notarized that same signature." *The Florida Bar v. Schramek*, 616 So.2d 979, 984 (Fla.1993) (citing *State v. Schramek*, CRC9006637CFANO–K (Fla. 6th Cir.Ct. Apr. 18, 1991).  In 1993, based on a petition by The Florida Bar, the Florida Supreme Court found that Schramek had "engaged in the unlicensed practice of law" and had "caused damage to those persons who sought his service and advice." *The Florida Bar v. Schramek*, 616 So.2d 979, 980 (Fla.1993).  The Florida Supreme Court permanently enjoined Schramek from the unauthorized practice of law and from appearing in "any court of this State, directly or indirectly, as a spokesperson or representative for litigants in any court proceeding."  Schramek's forgery of a legal instrument was also noted in the facts of a particular incident of unauthorized practice that was before the Florida Supreme Court for consideration.  The United States Bankruptcy Court for the Southern District of Florida also reviewed, on at least two occasions, the "paralegal" services rendered to bankrupt debtors by Schramek and the L.A.W. clinic, which was operated by Schramek and others.  Although the bankruptcy court did not find that Schramek had engaged in unlicensed practice of law, the Court determined that the fees charged by Schramek and the L.A.W. clinic were excessive and ordered the return of a portion of the fees to the Trustee. *See In re Calzadilla*, 151 B.R. 622 (Bankr. S.D.Fla.1993); *In re Rishel*, 149 B.R. 720 (Bankr.S.D.Fla.1993).

The docket of the Middle District, Tampa Division, is replete with frivolous cases filed by Schramek.  Of the fourteen cases filed by Schramek in the Middle District, Schramek has failed to pay the filing fees in all but two.  Schramek's lawsuits against state and federal officers and judges include *Schramek v. Yanchunis*, 90–539–Civ–T–23A; *Ippolito v. State*, 92–880–Civ–T–99C; *Schramek v. Weaver*, 92–1179–Civ–T–17A; and *Ippolito v. Ake*, 93–757–Civ–T–99A, all of which were dismissed with prejudice and two of which were dismissed as frivolous.  In at least one case Schramek was ordered to pay the defendants' fees and costs.  Schramek also attempted to intervene in and remove to this Court two state proceedings against his daughter for traffic violations. *See State v. Schramek*, 93–291–Civ–T–21C and *State v. Schramek*, 93–292–Civ–T–23A.  On April 18, 1994, Schramek filed seven bankruptcy appeals in the Tampa Division of the Middle District.  In each of the appeals his appellate brief is seriously delinquent.  Two of the appeals have been dismissed for failure to prosecute, and in at least one case Schramek has failed to respond to an order to show cause. *See Schramek v. U.S. Bankruptcy Court*, 94–647–Civ–T–17(a).  Lastly, Schramek filed an action in May, 1994, against Paula Corbin Jones, who is widely reported as claiming to have received sexual advances from now-President Clinton. *Schramek v. Jones*, 94–868–Civ–T–17A (M.D.Fla.).  Schramek's lawsuit against Ms. Jones alleges tortious interference with contract, based on the President's employment contract with the United States and Ms. Jones' presumed intrusion into his effectiveness in office, as a result of which Schramek claims an injury.  Of course, the Court has no view concerning the Clinton–Jones conflict, but the Schramek lawsuit suggests that he is a prolific source of complaints, tolerable perhaps on an individual basis but highly suspect in the important public issue of school desegregation.

In one instance, Schramek was permitted by the Florida Supreme Court to appear on behalf of a corporation and Schramek patently abused this privilege.  In *The Florida Bar v. Marina Securities*, 591 So.2d 185 (Fla.1991), the Florida Supreme Court, over the objection of The Florida Bar, permitted Schramek to appear on behalf of Marina Trust Services, Inc., in an action against the corporation for the unlicensed practice of law. *See The Florida Bar v. Schramek*, 616 So.2d 979, 985 (Fla.1993).  Schramek then claimed that he was "authorized to practice law in the State of Florida, without limitations or restrictions" and to "represent any person as defined by statute, including individuals," and threatened the "members of the judiciary" with lawsuits and criminal charges if they interfered with his access to courts and with his law practice. *Schramek*, 616 So.2d at 985–86.

Of course, Schramek's right to intervene in this action is distinct from the merits of his other cases or the results of those cases, whether frivolous, vexatious, and venomous; or, on the other hand, entirely benign, noble, and publicly beneficent.

identifying any issues for which he requests an evidentiary hearing. The "Proposed Intervenors Motion to Strike Exhibit B to Plaintiffs Proposed Findings of Fact and Conclusions of Law" is **DENIED** (Doc. 65).

The court notes that this case, as do many others, presents occasional difficulties and diversions, as events unfold both in and out of court. However, the occasional difficulties and compromises that disappoint and stir individuals as they observe the process of desegregation, in this case and others, similarly serve to fortify the conclusion that all parties are engaged earnestly in good faith deliberation to achieve the appointed objective. The essence of that deliberative process is careful and reasoned planning, complete with practical compromise between that which is presently desirable and that which is presently feasible. Plainly stated, only that and nothing more nor less has happened here.

ORDERED.